UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN


CK, by his Next Friend                    Honorable
Marisa Springstead,
                                          Case No:
        Plaintiffs,

v.

OAKLAND COMMUNITY HEALTH
NETWORK; WILLIE BROOKS, Director of
Oakland Community Health Network,
in his official capacity; MICHIGAN
DEPARTMENT OF HEALTH AND HUMAN
SERVICES; NICK LYON, Director of
Michigan Department of Health and
Human Services in his official capacity;
and RICK SNYDER,  Governor of Michigan,
in his official capacity;

        Defendants.

_____/


MICHIGAN PROTECTION & ADVOCACY
SERVICE, INC.
Andrea L. Rizor (P78382)
Chris E. Davis (P52159)
Attorneys for Plaintiff
4095 Legacy Parkway, Suite 500
Lansing, MI 48911
(517) 487-1755
arizor@mpas.org
cdavis@mpas.org
_____/

## **COMPLAINT**

## **I. INTRODUCTION**

1.  CK is an 11-year old child with developmental disabilities who is capable of living in the community at home with support services. For over seven months Defendants have failed to provide him with the authorized integrated home and community-based services he needs in order to do so, putting him at serious risk of institutionalization.

2.  Defendants have authorized CK for intensive home and community based services. He would be able to continue living in the community with his mother with the appropriate community and individualized support (which include Applied Behavior Analysis (ABA), Community Living Supports (CLS), and Respite). Due to the Defendants' administration, management, and funding of Michigan's service system, Defendants have placed CK at serous risk of experiencing needless isolation and segregation in violation of Section 504 of the Rehabilitation Act of 1973 and Title II of the Americans with Disabilities Act of 1990 as interpreted by *Olmstead v. LC ex rel Zimring*, 527 U.S. 581, 597-600 (1999).

## II. JURISDICTION AND VENUE

3.    This action is brought pursuant to Title II of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12132 *et seq.*; Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794; and the Social Security Act, 42 U.S.C. §§ 1396a(a)8; 1396a(a)(10).

4.    Jurisdiction is conferred by 28 U.S.C. §§ 1331, 1343.

5.    Declaratory and injunctive relief are authorized pursuant to 28 U.S.C. §§ 2201, 2202; 29 U.S.C. 794a; 42 U.S.C. § 1983; and 42 U.S.C. §12133.

6.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as all of the acts and omissions giving rise to the claims occurred in Oakland County.

## III. PARTIES

### A. The Plaintiff

7.    Plaintiff is an 11-year old Medicaid beneficiary. He is diagnosed with Autism Spectrum Disorder, Disruptive Mood Dysregulation Disorder, ADD, Moderate Intellectual Disability, and Obsessive Compulsive Disorder.

8.   Last year alone, Plaintiff received inpatient psychiatric treatment on three separate occasions at Kingswood Hospital, Harbor Oaks, and the Hawthorn Center for approximately 111 days.

9.   CK currently lives at home with his mother and next friend in Oakland County.

10.   CK's mother has repeatedly notified MORC she struggles caring for CK without the intensive supports his treatment team has declared medically necessary, which Defendants have failed to provide.

11.   Due to the family's exhaustion and safety concerns in the home, CK's risk of ending up in the foster care system has become not a matter of if, but when, given Defendants' continued failure to provide medically necessary services in the home for over seven months.

12.   CK has the right to live as independently as possible and remain at home with the community based services he requires, but Defendants' failure to provide these necessary services has resulted in multiple inpatient hospitalizations for CK, and has placed him at serious risk of further institutionalization, thus subjecting him to continued discrimination.

**B. The Defendants**

13. Defendant, Rick Snyder, is the Governor of the State of Michigan. Under Article V, Section 8, of the Michigan Constitution, he is charged with seeing that the laws of the State of Michigan are faithfully executed. He is also in charge of all departments of the Michigan government, including Michigan Department of Health and Human Services. *Id.*

14. Defendant, Rick Snyder, is sued in his official capacity.

15. Defendant, MDHHS, is the agency designated as the single state agency responsible for administering and implementing Michigan's Medicaid program under 42 U.S.C. § 1396a(a)(5).

16. Nick Lyon, is the Director of MDHHS.

17. As Director, Nick Lyon is responsible for ensuring Michigan's Medicaid program is administered and implemented consistent with the requirements of federal law.

18. Defendant, Nick Lyon is also responsible for administering and overseeing Michigan's entire Mental Health system pursuant to M.C.L. § 330.1104, given MDHHS' establishment, authority, and powers stem from Michigan's Constitution, which states "the health of the people of the state is a matter of primary public concern, and as

required by section 8 of article VIII of the state constitution of 1963, which declares that services for the care, treatment, education, or rehabilitation of those who are seriously mentally disabled shall always be fostered and supported, the department shall continually and diligently endeavor to ensure that adequate and appropriate mental health services are available to all citizens throughout the state." M.C.L. § 330.1116.

19. Defendant, Nick Lyon is sued in his official capacity.

20. Defendant, Oakland Community Health Network (OCHN), is a community mental health service program (CMHSP) established by the Michigan Mental Health Code where it states the "purpose of a community mental health services program shall be to provide a comprehensive array of mental health services appropriate to conditions of individuals who are located within its geographic service area, regardless of an individual's ability to pay." M.C.L. § 330.1206.

21. OCHN is required to provide mental health services to children with developmental disabilities living in Oakland County. M.C.L. § 330.1208.

22. OCHN is not only the community mental health service program for Oakland County operating under state law, it is a specialty prepaid

health plan (PIHP) considered a Medicaid managed care organization under M.C.L. § 400.109f. Under federal law, a Medicaid managed care organization provides or arranges for services under 42 U.S.C. § 1396u-2(a)(1)(B).

23.   Defendant, Willie Brooks, is the Director of OCHN. He has the ultimate responsibility, authority, oversight, and control over all of OCHN's services, programs, and operations.

24.   Defendant Willie Brooks is sued in his official capacity.

## IV. Statutory Provisions

### A.   Brief Overview of the Medicaid Program in Michigan for Individuals with Developmental Disabilities/Mental Illness.

25.   Plaintiff incorporates by reference paragraphs 1 through 24, as if fully set forth herein.

26.   The Medicaid program is jointly funded by the state and federal government under Title XIX of the Social Security Act.

27.   The Medicaid program provides medical assistance for certain low income children, families, pregnant women, disabled adults, and elderly.

28.   Michigan must operate and administer its Medicaid program in compliance with federal Medicaid statutes and regulations.

29.    States submit a plan for how the Medicaid program will be administered in accordance with federal law, called the State Plan. 42 U.S.C. § 1396a(a).

30.    Under federal law, that State Plan must contain and describe the nature and scope of the State's Medicaid program. 42 C.F.R. § 430.10.

31.    MDHHS has designated itself as the single state Medicaid agency responsible for administering the Medicaid program in Michigan under 42 U.S.C. § 1396a(a)(5).

32.    MDHHS contracts the provision of services out to ten prepaid inpatient health plans (PIHPs) throughout the state, including OCHN.

33.    Medicaid-covered specialty services and supports for Medicaid beneficiaries with a serious mental illness, developmental disability, serious emotional disturbance, or substance abuse disorder are managed and delivered by those PIHPs. M.C.L. 400.109f.

34.    MDHHS contracts with OCHN to provide and deliver these specialty services and supports as the PIHP for Oakland County. 42 U.S.C. § 1396u-2(a)(1)(B).

35. OCHN contracts the provision of services out to Macomb Oakland Regional Center (MORC). A majority of services are then once again contracted out by MORC to local provider agencies.

36. Under M.C.L. 400.109f, OCHN "shall be responsible for providing defined inpatient services, outpatient hospital services, physician services, other specified Medicaid state plan services, and additional services approved by the Centers for Medicare and Medicaid services under section 1915(b)(3) of title XIX of the Social Security Act, 42 U.S.C. § 1396n."

37. MDHHS is required to have methods of keeping itself informed of local agency adherence to the State Plan and take corrective action to ensure adherence. 42 C.F.R. § 435.903.

38. The Medicaid agency may not delegate to, other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, or regulations on program matters. 42 C.F.R. § 431.10.

39. MDHHS is required to make rules and regulations that it follows in administering the plan or that are binding upon local agencies that administer the plan. 42 C.F.R. § 431.10.

   **B.   The Americans with Disabilities Act (ADA).**

40.  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132.

41.  Title II's implementing regulations require under 28 C.F.R. § 35.130(d), that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities."

42.  In passing the ADA, Congress recognized:

> [I]ndividuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, failure to make modifications to existing facilities and practices, exclusionary qualification standards and criteria, segregation, and relegation to lesser services, programs, activities, benefits, jobs, or other opportunities; and

> [H]istorically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem[.]

42 U.S.C. § 12101(a)(4),(a)(7).

43.  The U.S. Supreme Court has held segregation of individuals with disabilities "perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life" and "severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, and economic independence." *Olmstead v. LC ex rel Zimring*, 527 U.S. 581, 597-600 (1999).

44.  Unjustified institutionalization constitutes a form of discrimination based on disability prohibited by Title II. *Id.* at 596.

45.  According to the Department of Justice and several federal Courts of Appeals (including the 2nd, 4th, 7th, 9th, and 10th), a plaintiff makes out a valid *Olmstead* claim "if a public entity's failure to provide community services. . . will likely cause a decline in health, safety, or welfare that would lead to the individuals' eventual placement in an institution." *Davis v. Shah*, 821 F.3d 231, 262 (2d Cir. 2016); http://www.ada.gov/olmstead/q&a_olmstead.htm.

**C.    Section 504 of the Rehabilitation Act of 1973.**

46.  Like the ADA, Section 504 of the Rehabilitation Act prohibits discrimination of individuals with disabilities under any program or activity receiving federal financial assistance. 29 U.S.C. § 794(a).

47. Its implementing regulations require entities receiving federal financial assistance to "administer programs and activities in the most integrated setting appropriate. . ." 28 C.F.R. § 41.51(d).

48. The implementing regulations further prohibit Defendants from directly, or through other arrangements, utilizing "criteria or methods of administration" that effectively subject individuals with disabilities to discrimination on the basis of their disability or that "substantially impair accomplishments of the objectives" of the program. 28 C.F.R. § 41.51.

   **D.   Section 1915 of the Social Security Act.**

49. Under federal law, Defendants are mandated to provide Early and Periodic Screening, Diagnosis, and Treatment services (EPSDT) to children under age 21 with reasonable promptness. 42 U.S.C. §§ 1396a(a)(10)(A),1396a(a)(43), 1396d(a)(4)(B), 1396d(r); 1396a(a)(8); and 42 C.F.R. § 435.930(a).

50. EPSDT services are defined under 42 U.S.C. § 1396d(r)(5) as:

> [T]he term 'early and periodic screening, diagnostic, and treatment services' means the following items and services: . . . (5) Such other necessary health care, diagnostic services, treatment, and other measures described in subsection (a) [42 USC 1396d(a)] of this section to correct or ameliorate defects and physical and mental illnesses and conditions discovered by the screening services,

whether or not such services are covered under the State plan.

51. MDHHS' Medicaid Manual describes Applied Behavioral Analysis (ABA) and Community Living Supports (CLS) as EPSDT services.

52. According to MDHHS' contract with OCHN, OCHN must have network adequacy such that no Medicaid child is placed on a waiting list for services. It further requires OCHN to provide services within 14 days of authorization to comply with reasonable promptness.

53. While States may adopt managed care concepts and contract with entities to oversee the delivery of services, arrange services through provider networks, and deliver services, in doing so, the state remains responsible for ensuring compliance with all relevant Medicaid requirements, including the mandates of the EPSDT program.  42 U.S.C. § 1396u-2.

54. The managed care contract must specify all mandatory benefits.  The State must ensure that the managed care entity has the capacity to offer the full range of necessary and appropriate preventive and primary services for all enrolled beneficiaries.   See 42 U.S.C. § 1396u-2.

55. The State additionally must have "methods and procedures" to assure that payments to providers are consistent with "efficiency,

economy, and quality of care and are sufficient to enlist enough providers so that care and services are available under the Plan at least to the extent that such care and services are available to the general population in the geographic area." 42 U.S.C. § 1396a(a)(30)(A).

## V. Statement of Facts

56.   Plaintiff incorporates by reference paragraphs 1 through 55, as if fully set forth herein.

57.   CK, is an 11-year old child diagnosed with Autism Spectrum Disorder, Disruptive Mood Dysregulation Disorder, ADD, Moderate Intellectual Disability, and Obsessive Compulsive Disorder.

58.   Through Michigan's Managed Care System, CK's Medicaid specialty services are administered by MDDHS, but delivered and managed by OCHN and MORC through contract.

59.   Last year alone, Plaintiff received inpatient psychiatric treatment on three separate occasions at Kingswood Hospital, Harbor Oaks, and the Hawthorn Center for approximately 111 days.

60.   One month into his last hospitalization at Hawthorn, the facility reported CK had very poor social skills, was "very oppositional" and defiant, had been aggressive towards staff and peers, was "very

14

intrusive" and disruptive, was unable to process information when upset, and was unable to sit still and required constant redirection.

61. Three months into that hospitalization, on August 25, 2016, the Psychiatric Hospital (Hawthorn) recommended Applied Behavior Analysis (ABA) therapy. It advised that ABA is a "therapy that aids children in developing age-appropriate skills through breaking down more complex skills into their basic components and gradually increases the child's competence in a variety of areas."

62. Ten days prior to discharge, the psychiatrist prescribed: "tentative discharge in 1 week, given continued medication adjustments and need for increased monitoring for side effects. Will discharge home with mother when medications are optimized and no further question of side effects. Intensive in-home services and staffing must be in place on discharge, but not limited to parent training and support, ABA, CLS, wraparound, and respite preferably with someone patient knows."

63. CK's discharge planning took place at Hawthorn whereby MORC had authorized Respite, CLS, Psychiatric, nursing care, ABA, and a parent trainer to be in place immediately upon discharge.

64. CK was discharged from Hawthorn on or around September 14, 2016.

65. CK was not discharged home with the respite, CLS, or ABA as authorized, despite promises these services would be provided immediately upon discharge.

66. On September 19, 2016, CK was again assessed for ABA services by Centria, a provider agency.

67. Centria contracts with MORC to provide in-home ABA.

68. MORC's supports coordinator made that referral for ABA to address CK's "significant problem behavior, stereotype, aggression, and communication deficits."

69. On September 20, 2016, MORC was notified by Centria it would only serve CK using male staff, but did not have male staff available and would have to seek additional staff through the hiring process.

70. On September 22, 2016, CK's grandmother pleaded with MORC to get the services in place stating: "Marisa has called several agencies and looked on several resources on her own and [for] some the pay is low, people are not interested in dealing with a problem child. You are the one who wanted CK to come home at this time. The doctors

said he was not ready. I really do not think you understand how fragile the whole situation is."

71.   In a written statement six days later, Centria determined that even with providing 30 hours of ABA services per week as recommended, CK would require two male technicians in a facility that specializes in severe and challenging behaviors. At that time, it was recommended that he return to an inpatient facility to have the highest probability of successful treatment.

72.   Center based ABA options were explored, all of which had and continue to have lengthy waiting lists.

73.   According to MORC's records, CK's mother called repeatedly seeking help from MORC after finding herself ill-equipped to handle CK's meltdowns and aggressive behavior. Many times the record reflects her indicating "I cannot keep going like this…services are not provided…respite is not provided and I cannot manage him anymore…he needs inpatient or residential asap."

74.   Defendants, through MORC, repeatedly failed to offer or provide crisis services such as mobile crisis or short term crisis residential (both of which are services under Michigan's EPSDT Medicaid program).

75. CK's mother filed a complaint with OCHN's Office of Recipient Rights when CK continued to be without the authorized services, alleging failure to provide services suited to condition.

76. On January 13, 2017, OCHN's office of recipient rights substantiated CK's allegation of failure to provide services suited to condition as a result of the delay in services. Among other things, it held: "Staffing and ABA therapy is needed to assist the complainant/mother with recipient #1's behaviors. Therefore the allegation of treatment suited to condition is substantiated."

77. To this date, MORC has attempted to find CLS, ABA, and in-home Respite services for CK, but providers are either not taking new referrals or have a lack of staffing.

78. On February 6, 2017, OCHN notified MORC it was trying to set up more contracts for ABA and asked MORC to provide in-home ABA services on an emergency basis for CK until an outside provider could step in.

79. On or about February 13, 2017, MORC instead sent another referral to Centria for ABA.

80. On or about March 6, 2017, a reassessment was performed by Centria.

81.  According to the record, Centria recommended in-home ABA. Due to CK's "high frequency and intensity" of aggressive and challenging behaviors, Centria agreed to serve him only if approved for two ABA technicians (2:1), with one being male.

82.  This was eventually approved by MORC and OCHN.

83.  Centria's records indicate the family is extended with regard to the support CK needs in order to remain in the home and anticipates as CK's time spent in the home drastically increases when school is out for summer, so do his chances of ending up in the foster care system.

84.  In early March 2017, Centria indicated it would likely take a year to start CK's ABA due to a lack of staffing. "As far as staffing we have an extreme shortage of qualified BC's or BCBA's in the Oakland Area. At the moment I don't really know how long a wait might be. I would say optimistically 3 months minimum but likely much longer than that and I wouldn't be surprised if it was as long as a year."

85.  During an Individualized Plan of Service (IPOS) meeting on May 11, 2017, MORC's supports coordinator and supervisor confirmed there are no other in-home ABA providers that contract with Medicaid in Oakland County other than Centria. It was also confirmed that a number of the children served by MORC have been unable to obtain

the CLS and Respite services as authorized in their plan due to lack of staff.

86. Finally, after eight months of waiting for CLS, MORC obtained a CLS provider. CLS services started on or around May 23, 2017. This provider however has never been successful in fulfilling the authorized number of hours due to lack of staffing.

87. As of this writing, the CLS provider is fulfilling less than fifteen percent of the authorized CLS hours.

88. In desperation, CK's mother requested residential treatment given services were not being provided in the home. This request was denied by OCHN with an explanation that "his needs can be addressed in the community/least restrictive setting."[1]

89. In response to an influx of complaints to the legislature on staffing shortages and staffing turnover, the Michigan legislature ordered MDHHS to establish a workgroup consisting of PIHP network providers and others to "analyze the workforce challenges of recruitment and retention of staff who provide Medicaid-funded community living supports, personal care services, respite services,

---

[1] Under Michigan's Medicaid program, "Medicaid does cover services provided to children with developmental disabilities in a [child caring institution] CCI that exclusively serves children with developmental disabilities [. . .]" See Michigan's Medicaid Provider Manual. A CCI is defined under Michigan law to include "institutions for developmentally disabled or emotionally disturbed minor children." M.C.L. § 722.111.

skill building services, and other similar supports and services."
Exhibit 1, *Recruitment and Retention Challenges for the Workforce
Delivering the Most Frequently Used Supports and Services.*

90.   In 2015, MORC warned the legislature of numerous problems with
the Medicaid delivery system which has resulted in an increase in
deaths in Oakland County alone. Exhibit 2.

91.   On or around September 30, 2016, the Section 1009 workgroup
finalized its recommendations. Exhibit 1.

92.   The Section 1009 workgroup substantiated the difficulties Medicaid
funded agencies and beneficiaries have in attracting and retaining
competent staff resulting in "negative outcomes and consequences
for beneficiaries, their employers, direct support staff, the system of
supports and services, and the state of Michigan."

93.   The MDHHS workgroup concluded "the direct support workforce is
woefully understaffed, rendering the Medicaid funded supports and
services delivery system unstable. This instability has led to declines
in access and quality of the supports and services delivered." Exhibit
1, pg 16.

94.   The Workgroup further reported:

> "[a]fter months of discussion and review of available
> data, the workgroup on the direct support workforce

mandated by the Michigan Legislature has concluded that the critically important frontline workforce delivering face-to-face supports and services to the state's residents with intellectual and developmental disabilities, mental illness, or substance use disorders is not stable. Employers, including individuals using self-determination as well as organizational employers are not able to recruit and retain a qualified, competent workforce. In order to fulfill the service and support requirements of both the state's Mental Health Code and the Medicaid program, additional state investments and new state policies and practices are needed to secure the dignity, well-being, and independence of people living with disabilities.

95. Since this report, the legislature and MDHHS have done little to resolve the staffing crisis as experienced by CK and his family.

## VI. LEGAL CLAIMS

### A. First Claim for Relief: Violation of Title II of the Americans with Disabilities Act (ADA).

96. Plaintiff incorporates by reference paragraphs 1 through 95 as if fully restated herein.

97. Plaintiff is an individual with a disability that substantially limits one or more major life activities, including communicating, learning, concentrating, and neurological and brain functioning. 42 U.S.C. § 12102(1). Specifically, Plaintiff is an individual with Autism and is regarded by all Defendants as having a developmental disability.

98.  Plaintiff is a qualified individual under 42 U.S.C. § 12131(2) to participate in Medicaid as he has been and continues to receive Medicaid.

99.  Defendants, acting in their official capacities, are public entities within the meaning of Title II of the ADA. 42 U.S.C. § 12131(1)(A)&(B).

100.  The Defendants have violated and are violating Title II of the ADA by failing to provide meaningful alternatives to institutionalization. By operating and allowing long waiting lists and failing to ensure adequate capacity for services, Defendants have failed to administer, manage, fund, and operate its service system to ensure CK has timely access to home and community-based services required to prevent him from institutionalization, placing him at serious risk of segregation.

101.  Providing CK with timely access to home and community based services would not fundamentally alter the Defendants' service system which already requires services be made available to CK with reasonable promptness, prohibiting waiting lists and delays over 14 days.

102.  As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff is at serious risk of institutionalization.

103. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has sustained injuries and damages.

104. Plaintiff seeks declaratory relief, injunctive relief, and damages for Defendants' violations under Title II of the ADA.

**B.    Second Claim for Relief:  Violation of Section 504 of the Rehabilitation Act of 1973.**

105. Plaintiff incorporates by reference paragraphs 1 through 104 as if fully restated herein.

106. Plaintiff is an individual with a disability that substantially limits one or more major life activities, including communicating, learning, concentrating, and neurological and brain functioning. 29 U.S.C. §705(20)(B); 42 U.S.C. § 12102.  Specifically, Plaintiff is an individual with Autism and is regarded by all Defendants as having a developmental disability requiring substantial functional limitations in three major life activities under state law.

107. Plaintiff is qualified to participate in Medicaid with or without reasonable modifications to Defendants' rules, policies, or practices. Plaintiff meets the essential eligibility requirements to receive Medicaid and does so. 29 U.S.C. §705(20)(B); 42 U.S.C. § 12102.

108. Defendants receive federal financial assistance for their programs and activities within the meaning of 29 U.S.C. § 794(b).

109. The Defendants have violated and are violating Section 504 of the Rehabilitation Act of 1973 and its implementing regulations by using methods of administration which substantially impair the accomplishments of the Medicaid program.

110. This includes, but is not limited to, operating and allowing long waiting lists for services, not providing, not making timely available, and not ensuring authorized and medically necessary Medicaid services are provided.

111. Defendants' administration, management, operation, and funding of the Medicaid program has resulted in the repeated institutionalization of CK and continues to place him at serious risk of institutionalization.

112. The Defendants have violated and are violating Section 504 of the Rehabilitation Act of 1973 and its implementing regulations by administering, funding, and operating their service system in a manner that fails to make services available timely and available in the most integrated setting appropriate to CK's needs.

113. Providing CK with timely access to home and community based services would not fundamentally alter the Defendants' service system which already requires services be made available to CK with

reasonable promptness, prohibiting waiting lists and delays over 14 days.

114. As a direct and proximate result of Defendants' unlawful discrimination, Plaintiff has sustained injuries and damages.

115. Plaintiff seeks declaratory relief, injunctive relief, and damages for Defendants' violations under Section 504 of the Rehabilitation Act.

   **C.  Third Claim for Relief:  Violation of the Social Security Act Title XIX's EPSDT provisions, 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43) and 1396d(r)(5).**

116. Plaintiff incorporates by reference paragraphs 1 through 115, as if fully set forth herein.

117. CK is an 11-year old Medicaid beneficiary authorized to receive medically necessary intensive home and community based EPSDT services including ABA, CLS, and in-home Respite.

118. CK has been authorized and is entitled to these medically necessary services under 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43) and 1396d(r)(5).

119. Defendants have failed to provide medically necessary EPSDT behavioral and mental health services in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43) and 1396d(r)(5).

120. As a result, Defendants, acting under the color of state law, have denied CK his rights, privileges, and immunities secured by the laws of the United States.

### D. Fourth Claim for Relief:  Violation of 42 U.S.C. § 1983 and the Social Security Act Title XIX, 42 U.S.C. § 1396a(a)(8).

121. Plaintiff incorporates by reference paragraphs 1 through 120, as if fully set forth herein.

122. The Social Security Act at 42 U.S.C. § 1396a(a)(8), requires medical assistance to be furnished with reasonable promptness to all eligible individuals.

123.  CK is entitled to receive EPSDT behavioral and mental health services that are required to treat or ameliorate his behavioral, emotional, and psychiatric conditions under Medicaid.

124. CK has not received and continues to not receive these services in a timely and/or reliable manner at all or to the extent necessary to treat or ameliorate his behavioral, emotional, or psychiatric impairments.

125. The Defendants have failed to provide such medically necessary services with reasonable promptness, in violation of 42 U.S.C. §1396a(a)(8) and 42 C.F.R. § 435.930(a).

126. As a result, the Defendants, acting under the color of state law, have denied CK his rights, privileges, and immunities secured by the laws of the United States.

## REQUESTED RELIEF

Wherefore, Plaintiff respectfully requests this Court to:

A.   Declare Defendants violated and are violating Plaintiff's rights under Section 504 of the Rehabilitation Act and Title II of  the ADA.

B.   Declare Defendants violated and are violating Plaintiff's rights under the Social Security Act's Reasonable Promptness and EPSDT provisions.

C.   Order Defendants to provide CK's authorized CLS, In-Home Respite, and In-Home ABA immediately and order daily penalties for the failure to comply with that order.

D.   Order Defendants to develop adequate alternative or contingency plans to prevent an interruption in the provision of CLS, Respite, and ABA.

E.   Order Defendant, Nick Lyon to promulgate policies requiring Adequate and Advance Action Notice to be sent when an

authorized service is not provided within a prescribed period of time.

F.      Order Defendant, Nick Lyon, to impose greater reporting requirements on delays in service and implement policies mandating responsive action.

G.      Issue injunctive relief against Defendants for violating Plaintiff's rights as complained of herein, and require them to take such actions as are necessary to stop ongoing practices which led to this Complaint.

I.      Enter a judgment against Defendants in an amount consistent with damages sustained.

J.      Grant attorney's fees and costs.

K.      Grant such other relief as it may appear Plaintiff is entitled or this court deems necessary.

Respectfully submitted,


Dated: June 21, 2017              s/_____
                                  Andrea L. Rizor
                                  Michigan Protection and Advocacy
                                  Service, Inc.
                                  4095 Legacy Parkway, Suite 500
                                  Lansing, MI 48911
                                  (517) 487-1755
                                  P78382